THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM L. DAVIS, Defendant-Appellant.

First District (4th Division)    No. 79-1263

Opinion filed February 5, 1981.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Richard Burke, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, William L. Davis, was found guilty of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1). He was sentenced to serve a term of 20 to 60 years in the penitentiary.

On appeal, defendant contends the trial court erred in: (1) denying his motion to quash his arrest in his home which was performed without a warrant; (2) denying his motion to suppress evidence found in his automobile, which evidence was found pursuant to a search without a warrant; (3) denying his motion in limine to prohibit the State from introducing into evidence a dying declaration or spontaneous utterance made by the deceased victim; and (4) refusing to give his proposed jury instruction on circumstantial evidence.

We affirm.

The events in this case began on the evening of July 9, 1976. At approximately 9:30 p.m., two witnesses saw Lamont Lloyd, the victim, in a Cadillac with defendant and defendant's brother, Richard Davis. (The witnesses knew the names of the persons in the Cadillac from prior meetings.) Richard Davis was driving, defendant was in the back seat, and Lloyd was in the front seat. The Cadillac belonged to defendant. At approximately 9:50 p.m., Lawrence Martin, a United Parcel Service worker, found Lloyd lying in the street near the intersection of 15th and Union Streets in Chicago. Lloyd had been shot four times, once in the head. Lloyd was still alive when Martin found him but had lost a lot of blood. Lloyd told Martin he had been shot and asked to be taken to a hospital. Martin and an unidentified passerby helped Lloyd into Martin's van.

The trip to the hospital took approximately five minutes. On the way, Lloyd continuously urged Martin to run the red lights and get him to the hospital. Shortly after the trip began, Martin asked Lloyd his name. Lloyd told him his name. Martin then asked, "Where are you shot?" Lloyd answered, "All over, William shot me." Shortly thereafter, Lloyd, while continually urging Martin to run the red lights, said that he was dying. When they reached the hospital, Martin got out of his van to seek help. At this time, Martin saw Lloyd "jumping around" in the seat. After Martin returned with aid, Lloyd was removed from the van and taken into the hospital. At this time, Lloyd was unconscious. Minutes later, in the hospital, Lloyd was pronounced dead on arrival.

During the night of July 9, 1976, and throughout the early morning hours of July 10, police investigated the incident. They interviewed the two witnesses who had seen Lloyd with defendant in defendant's Cadillac and also interviewed Martin. The two witnesses told them what they had seen and Martin told them of his conversations with Lloyd in Martin's van.

Martin took the police to the scene where Martin had found Lloyd. There, the police found a pool of blood. It was later determined that this blood, type O, matched Lloyd's. The police also determined that defendant was the owner of the Cadillac and determined where defendant lived. At approximately 4 a.m., July 10, several police officers went to defendant's basement apartment residence. No one was home but the police talked to defendant's sister who lived in the apartment above defendant's. The police told her they were looking for defendant and his brother, Richard. Defendant's sister told them she had not seen them all day.

At approximately 8:30 a.m., July 10, the investigation of the incident was turned over to several police investigators when they came on duty. One of these investigators was Walter Siemieniak. After learning of the events of the previous night, Siemieniak and several other investigators went to defendant's residence. When they arrived, they saw defendant's Cadillac parked in the street across from defendant's apartment building. Siemieniak walked over to defendant's car and looked through the window. He saw what he thought to be blood on the front seat of the car. To him it looked as if someone had tried to wipe the blood off the seat.

Thereafter, the investigators went up to the defendant's apartment. The door to defendant's apartment was open. Directly outside the apartment, the police found Richard Davis. They approached him and asked him his name. He told them and they "took him into custody." According to the investigators, Richard Davis then "allowed" them to walk into the apartment. Upon entry, the investigators encountered defendant, whom they immediately placed under arrest.

Upon the request of Siemieniak, defendant gave one of the investigators the keys to his car. Siemieniak told one of the other investigators to drive defendant's car back to the police station. At the station, the car was thoroughly searched. Police took samples of the blood on the front seat of the car, and it was later determined that the blood was human blood but there was an insufficient quantity to determine the blood type. On the rear floor of the car, the police discovered a fired .22-caliber bullet. This bullet was later compared with the four bullets taken from Lloyd's body. These four bullets were also .22-caliber. Because of the condition of the bullet found in the car, the police could not determine conclusively that it had been fired from the same weapon as the other four bullets, but there was a close similarity in the rifling characteristics between the bullet found in the car and the other bullets. No gun was ever found by the police.

After the defendant was arrested, he was taken to police headquarters and his *Miranda* rights were read to him. Thereafter, the defendant was questioned by Investigator Siemieniak. Defendant initially denied any

wrongdoing. After further questioning, Siemieniak asked defendant if he had shot Lloyd. The defendant nodded his head up and down. Siemieniak then asked defendant how many times he had shot Lloyd. Defendant answered, "I don't know, but it was a lot." Defendant then retracted his statements and denied any wrongdoing.

At trial, all of the above evidence discovered by police, was admitted. The jury found defendant guilty of murder.

OPINION

I

■■ Defendant first contends the trial court erred in denying his pretrial motion to quash his arrest and to suppress all evidence that resulted from his arrest. Defendant admits there was probable cause for his arrest but asserts that the entry into his home without a warrant to effect his arrest cannot be justified by probable cause alone. He correctly maintains that, absent consent to enter, "exigent circumstances" are necessary to render such a seizure of his person reasonable under the Constitutions of the United States and Illinois. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6; *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) However, he also maintains, and we believe incorrectly, that exigent circumstances were absent in this case.

In determining whether exigent circumstances justifying prompt police actions exist, our courts have generally relied on the factors set out in *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385. (See, *e.g.*, *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543; *People v. Sanders* (1978), 59 Ill. App. 3d 6, 374 N.E.2d 1315.) Included among the factors considered important under the *Dorman* decision are the following: (1) whether a grave offense is involved, particularly one that is a crime of violence; (2) the suspect is reasonably believed to be armed; (3) there exists not merely the minimum of probable cause that is required when a warrant has been issued but beyond that a clear showing of probable cause; (4) strong reason exists to believe the suspect is in the premises being entered; (5) there is a likelihood that the suspect will escape if not swiftly apprehended; (6) whether the entry is forceable or peaceful; and (7) the time of entry, day or night.

Before discussing the presence or absence of the above factors in this case, we first point out that we believe that the factors enumerated in *Dorman* are not necessarily the only factors that can be considered, nor do we believe that the absence of one of the *Dorman* factors necessarily precludes the police from making a warrantless entry into a home to make an arrest. The guiding principle governing searches and seizures under

constitutional provisions is reasonableness, and whether the police have acted reasonably depends on the circumstances of each case. *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.

■■ We also point out, since defendant has placed great reliance on it, that the mere fact that the police may have had time to obtain a warrant, though important, is not necessarily controlling. The test under the Constitution is not whether it was reasonable to procure a warrant, but whether the search or seizure was reasonable. (*Cooper v. California* (1967), 386 U.S. 58, 17 L. Ed. 2d 730, 87 S. Ct. 788.) We also note that exigent circumstances necessitating prompt police action may arise after the police have had time to procure a warrant, and when this occurs the police may still act without a warrant. *Cardwell v. Lewis* (1974), 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (plurality opinion).

■■ In the present case, before determining whether exigent circumstances actually existed, we must first determine at what point in time it is necessary to determine whether exigent circumstances existed. It is the unauthorized entry into a home to effect a warrantless arrest that is presumed to be repugnant to the Constitutions of the United States and Illinois. Thus, in determining whether exigent circumstances existed, we must look back from the time just before the police made their attempt to enter defendant's home and at the time of entry. Keeping this in mind, we now consider the factors enumerated in *Dorman.*

First, there was clearly a grave offense involved here, a crime of violence, murder. Second, the murder was obviously committed by use of a firearm, and the police could have reasonably believed that prompt action to apprehend the defendant was necessary because the defendant could still be armed and dangerous. Third, there was clear probable cause to believe that defendant was involved in the crime. The victim had been seen in defendant's car with defendant minutes before the victim was found in the street. The police had a statement from the rescuer, Martin, that the victim had said, "William shot me," and the police knew the defendant's name was William Davis. Finally, when the police arrived at defendant's residence, one of the investigators saw blood in defendant's car. Thus, there was clear probable cause to believe defendant was involved in the incident.

Fourth, there was strong reason to believe that defendant was in the premises being entered. Defendant's car was seen by police parked in the street outside his home. The police knew defendant lived in the basement apartment which they entered. The police, just before attempting to enter defendant's apartment, found defendant's brother, also a suspect in the crime, standing outside defendant's apartment. Thus, the police had strong reason to believe defendant was inside the apartment.

Fifth, there was a strong likelihood that defendant would escape if

not swiftly apprehended. Police placed defendant's brother under arrest before attempting to enter, and there is little question that this action was valid. Defendant would obviously know that his brother had been apprehended. If police had then been required to leave to obtain a warrant, defendant could have escaped. Also, to require police, in these circumstances, to post a guard while a warrant was obtained could have created a situation of danger since police could have reasonably believed defendant was still armed.

Sixth, the entry into defendant's apartment was clearly peaceful. The door to the apartment was open. Defendant's brother "allowed" them to enter. Though this may not have been consent to their entry, it does show that no one protested to the entry.

Finally, the entry was made in the daytime when defendant could easily have discovered the presence of police outside of his apartment. Because defendant was believed to be armed and dangerous, an immediate entry was necessary to protect the police.

Hence, it is clear that all of the factors enumerated in *Dorman* were present in this case and that exigent circumstances existed for the police to take prompt action and make the entry into defendant's home to effect his arrest without a warrant. Accordingly, we hold that the arrest of defendant without a warrant was constitutionally reasonable.

## II

Defendant next contends the trial court erred in denying his motion to suppress the evidence found in his automobile. Defendant actually argues three distinct issues here. First, he contends that Investigator Siemieniak's looking through the window of his car was an unreasonable search and Siemieniak's testimony that he saw what he thought to be blood on the front seat should have been suppressed. Second, he contends that since he was already under arrest and the police had the keys to his car, the seizure of his parked automobile, without a warrant, constituted an unreasonable seizure and any evidence discovered as a result of this seizure should have been suppressed. Third, he contends that, assuming the seizure was proper, the subsequent warrantless evidentiary search of his car at the police station was an unreasonable search and the evidence found in his car should have been suppressed. We disagree with all of the defendant's contentions.

We first consider the issue raised by defendant that Investigator Siemieniak's looking through the window of defendant's car was an unreasonable search. However, we find that we do not have to address the issue of whether the search was reasonable or unreasonable because we believe that Investigator Siemieniak's acts did not constitute a search.

A search implies a prying into hidden places for that which is not

open to view. (*People v. Bombacino* (1972), 51 Ill. 2d 17, 280 N.E.2d 697, *cert. denied* (1972), 409 U.S. 912, 34 L. Ed. 2d 173, 93 S. Ct. 230.) In the present case, defendant's car was on a public street. A police officer *obviously has a right to be on a public street and to observe what he can see from that vantage point.* What is open to full view through a window of a car parked on a public street is not something that is in a hidden place. We are unaware of any Federal or State constitutional prohibition that prevents a police officer from looking through the window of a parked car on a public street.

██ Also, it has many times been said that a fundamental purpose of the constitutional right to be free from unreasonable searches and seizures is to shield a person from unwarranted government intrusions into his reasonable expectations of privacy. (*United States v. Chadwick* (1977), 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476; *Cardwell v. Lewis* (1974), 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (plurality opinion); *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507.) A person who parks his car on a public street can have no reasonable expectation of privacy in that which can be plainly seen by passersby through the windows of his car. Since Investigator Siemieniak's conduct in looking through the car window did not equate with a search and did not invade any legitimate interest in privacy of the defendant, we necessarily find there was no violation of defendant's constitutional rights. Investigator Siemieniak's testimony as to what he observed was properly admitted into evidence.

We next consider whether the warrantless seizure of defendant's car was reasonable. Defendant places great reliance on the case of *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 27 L. Ed. 2d 564, 91 S. Ct. 2022 (plurality opinion). In that case, after several weeks of investigation, the police concluded they had probable cause to arrest defendant for murder and to seize and search his two cars. The police procured the applicable warrants. However, these warrants were later declared invalid by the Supreme Court. Based on the invalid warrants, the police went to defendant's home and arrested him. The police also impounded his two cars which were parked in his private driveway. Later, at the police station, the police searched the cars. One of the questions presented in *Coolidge* was whether the seizure of defendant's cars was proper without a valid warrant. It was admitted that the police had probable cause to seize the cars. However, the Supreme Court found that probable cause alone was insufficient and "exigent circumstances" had to be shown. The State attempted to argue that the cars were in "plain view." The court rejected this argument and held that the plain view doctrine did not apply. The court pointed out that the plain view doctrine implies the seizure of an object in the course of a valid search and from a location

where the police have a right to be. In *Coolidge*, the police had no right to be on defendant's property.

We believe that defendant's reliance on *Coolidge* is misplaced. Crucial to that decision was that the seizure of the cars occurred on defendant's private property and thus the cars were seized from a place where the police had no right to be. The importance of this factor was pointed out by the Supreme Court in *Cardwell v. Lewis* (1974), 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (plurality opinion). In that case, after several months of investigation, police concluded that they had probable cause to arrest defendant for murder. The victim had been killed by a shotgun blast, and his body had been left in his own car. The victim's car, containing the body, was pushed over an embankment by the defendant using his own car. The police procured a valid arrest warrant but did not procure a warrant to seize or search defendant's car. Upon police request, the defendant came to the police station and gave himself up. After being placed under arrest, the defendant gave police the keys to his car and told them the car could be found in a public parking lot. The police then seized the car, drove it to the police station, and subsequently removed paint scrapings from the fender. These scrapings matched the paint of the victim's car. The Supreme Court, finding probable cause existed, upheld the validity of the seizure of the defendant's car. The court distinguished *Coolidge* by pointing out that the *Coolidge* opinion had relied principally on the fact that the police had seized the automobile in a private driveway and not in a place open to the public where the police had a right to be.

■■ We believe the *Cardwell* decision stands, at the very least, for the proposition that police may, without a warrant, seize an automobile parked in a public place based on probable cause to believe that the automobile itself is an instrumentality used in a crime, and thus constitutes evidence of the crime, and on probable cause to believe that the automobile contains evidence of the crime. (See also *People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627.) In the present case, the police had probable cause to believe the defendant's car was an instrumentality used in the crime and contained evidence of the crime because the car was seen with the victim inside shortly before he was shot, the victim was found in the street and thus was probably ejected from a car, and blood was seen inside defendant's car. Thus, here, it is clear that the police, based upon the circumstances that existed, made a warrantless but permissible seizure of defendant's car.

Our conclusion is further buttressed by the Supreme Court's decision in *G. M. Leasing Corp. v. United States* (1977), 429 U.S. 338, 50 L. Ed. 2d 530, 97 S. Ct. 619. That case partly involved the power of the I.R.S. to seize a taxpayer's automobile to satisfy an unpaid tax assessment. One of

the issues before the court was whether the warrantless seizure of petitioner's automobiles, all of which were seized in public places, could be justified based solely on probable cause to believe that the automobiles were properly subject to seizure. In holding that probable cause was sufficient, the court noted, "The seizures of the automobiles in this case took place on public streets, parking lots, and other open places, and did not involve any invasion of privacy." (429 U.S. 338, 351, 50 L. Ed. 2d 530, 543, 97 S. Ct. 619, 628.) Since the fundamental purpose of the constitutional right prohibiting unreasonable seizures and searches is the protection of privacy, and since the police in the present case seized the car on a public street and did not not invade any legitimate expectation of privacy by such seizure, then the seizure was reasonable as long as it was based on probable cause. Hence, we reject defendant's argument that the seizure of his automobile was unreasonable.

■■ We next consider whether the subsequent warrantless search of defendant's automobile was reasonable in this case. As defendant points out, lawful custody of an automobile does not of itself dispense with constitutional requirements of searches thereafter made of it. (*Cooper v. California* (1967), 386 U.S. 58, 17 L. Ed. 2d 730, 87 S. Ct. 788.) A search of the interior of an automobile involves an invasion of privacy. (*United States v. Ortiz* (1975), 422 U.S. 891, 45 L. Ed. 2d 623, 95 S. Ct. 2585.) However, the warrantless search of an automobile has traditionally been treated differently from the warrantless search of a home, office, or other private place, as indicated by the Supreme Court's creation of what has become known as the "automobile exception" to the warrant requirement. Under this exception police are allowed to stop an automobile on the highway and conduct an immediate warrantless search based on the probable cause to believe the automobile contains evidence of a crime. (*Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975; *Carroll v. United States* (1925), 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280.) The reason for the "automobile exception" is two-fold.

First, the exception of privacy in an automobile is much less than the expectation of privacy in a home or office. Automobiles, unlike homes or offices, are subjected to pervasive and continuing governmental regulation and control. (*South Dakota v. Opperman* (1976), 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092.) Also, an automobile's purpose is transportation and it seldom serves as one's residence or as a repository of personal effects, and an automobile travels public thoroughfares where both its occupants and its contents are in plain view. *Cardwell v. Lewis* (1974), 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (plurality opinion).

Second, the inherent mobility of an automobile creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. (*South Dakota v. Opperman* (1976),

428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092.) One of the circumstances of exigency that frequently occurs is that the facts furnishing probable cause to search an automobile are often unforeseeable and do not arise until police have discovered the automobile. (*Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975.) Because of this, and because the automobile is readily movable, making the opportunity for a search fleeting, it would be an exercise in futility for the police to leave the automobile to procure a search warrant, and to require police to detach a special detail to guard the automobile while a warrant is obtained or to require police to impound the automobile for a later search at the police station where a warrant can easily be obtained would impose a constitutional burden upon police departments of all sizes around the country and this State to have available the people and equipment necessary to carry out these requirements. (See *Arkansas v. Sanders* (1979), 442 U.S. 753, 765 n.14, 61 L. Ed. 2d 235, 246 n.14, 99 S. Ct. 2586, 2594 n.14.) When one weighs the societal costs of such a burden against the diminished expectation of privacy in an automobile, it becomes clear that an immediate search is reasonable based on probable cause alone. See *Arkansas v. Sanders* (1979), 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586; *Cardwell v. Lewis* (1974), 417 U.S. 583, 41, L. Ed. 2d 325, 94 S. Ct. 2464 (plurality opinion); *Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975.

In the present case, the parties agree that probable cause existed to search defendant's automobile. The parties are also in apparent agreement that if the exigencies justifying the "automobile exception" exist in this case, the police could have conducted an immediate search of the automobile on the scene, and the fact that the police chose to seize the automobile and search it later at the police station is irrelevant because such a search would still be reasonable. (*Texas v. White* (1975), 423 U.S. 67, 46 L. Ed. 2d 209, 96 S. Ct. 304; *Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975.) Thus, the issue presented here is whether the exigencies justifying the "automobile exception" exist in this case. The determination of this issue depends on the comparison between this case and the Supreme Court's decisions in *Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975, and its progeny, and a comparison between this case and the court's decision in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (plurality opinion).

We will first discuss *Chambers* to show how this case contains the exigencies justifying the applicability of the "automobile exception." We will then discuss *Coolidge* and point out why that case is inapplicable to the circumstances involved in this case.

The facts in *Chambers* are as follows. Shortly after learning of a

nighttime armed robbery, police stopped on the highway an automobile containing four occupants. Two of the occupants and the car fit descriptions given to police as being involved in the robbery. The occupants of the car were immediately placed under arrest. The car was then driven by police to the police station and searched there without a warrant. The search was not done on the scene of the arrest ostensibly because it was too dark to do so. The Supreme Court upheld the search as reasonable based on the "automobile exception." The fact that the car was not searched on the scene but was searched at the station was not deemed to be relevant. See also *Texas v. White* (1975), 423 U.S. 67, 46 L. Ed. 2d 209, 96 S. Ct. 304.

There are crucial facts in *Chambers* that are similar to those in the present case. Both in *Chambers* and the present case the seizures of the automobiles, based on probable cause to believe they were instrumentalities used in the crimes and contained evidence of the crimes for which defendants were arrested, were reasonable because they were done in a public place. (*Cf. Cardwell v. Lewis* (1974), 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (plurality opinion) (seizure in a public parking lot held reasonable).) In *Chambers*, as a practical necessity, the police could not have obtained a warrant before stopping the automobile because the police did not know where the automobile was until discovery and did not have probable cause to search until they stopped it. In the present case, the police did not know beforehand that they would discover defendant's car where they did and could not be sure it contained evidence of a crime until they discovered blood on the front seat of the car, and thus, as a practical necessity, the police could not have obtained a warrant before discovering defendant's automobile.

In *Chambers*, one of the reasons an immediate search would have been proper was because otherwise the police, even if they had not had the people and equipment to do so, would have been constitutionally required to detach a special detail to watch the automobile while a warrant was obtained or impound the vehicle for a later search at the police station where a warrant could easily be obtained. (See *Arkansas v. Sanders* (1979), 442 U.S. 753, 765 n.14, 61 L. Ed. 2d 235, 246 n.14, 99 S. Ct. 2586, 2594 n.14.) Likewise, in the present case, one of the reasons an immediate search would have been reasonable was because otherwise the police, even if they did not have the people or equipment to do so, would have had to detach a special detail to watch the car while a warrant was obtained or impound the vehicle for a later search at the police station after a warrant was procured. One may contend that such is not true in the present case because defendant was already under arrest and the police had his set of keys to the car, and thus the police could have left, obtained a search warrant, and returned later because the possibility of the car's

being moved was minimal. However, in *Chambers*, the court said an immediate search could have been reasonable despite the fact in that case that all of the occupants of the car were placed immediately under arrest when the police stopped the car and any search that could have been conducted would have occurred after the arrest. This fact was particularly noted by the Supreme Court in *Cardwell v. Lewis* (1974), 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (plurality decision). There, in finding *Chambers* indistinguishable, the court upheld a seizure of an automobile in a public parking lot and the subsequent search of the outside of the automobile even though the defendant was under arrest at the police station and the police had the keys to his car hours before they seized it. The car could have possibly been moved by friends or relatives of the defendant who had an extra set of keys and the exigency of posting a guard still obtained. Here, as in *Chambers* and *Cardwell*, the police could have believed that the automobile could have been moved by a friend or relative of defendant and in particular could have believed that defendant's sister who lived in an apartment directly above defendant's apartment had access to the automobile and the exigency of posting a guard or impounding the vehicle still existed.

Thus, the present case falls within the parameters of *Chambers*. The only distinguishing factor between *Chambers* and this case is that in *Chambers*, because it was dark, the police had a reason for not searching the car immediately, and the subsequent search was partially justified because of this. However, in *Texas v. White* (1975), 423 U.S. 67, 46 L. Ed. 2d 209, 96 S. Ct. 304, this factor was held to be insignificant. In that case, police were called to a bank in the daytime because defendant was attempting to pass forged checks at the drive-in window. When police arrived, they ordered defendant to park his car on the curb of the street. He obeyed, but upon doing so he was seen by a bank employee and one of the officers "stuffing" something (later learned to be forged checks) between the seats of his car. The defendant was arrested and his car was seized and subsequently searched at the police station. The warrantless search was upheld as proper and the court said *Chambers* was directly on point.

It is now clear that this case is controlled by *Chambers* and that the "automobile exception" applies. Other Illinois cases with similar facts have held the same. (See, *e.g.*, *People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627; *People v. Walls* (1980), 87 Ill. App. 3d 256, 408 N.E.2d 1056.) Despite the substantial authority for our conclusion we nevertheless will address the defendant's reliance upon *Coolidge v. New Hampshire* and show why that case is inapplicable. As previously noted, in *Coolidge*, after several weeks of investigation of a murder case, the police obtained

warrants to arrest defendant and to search his two automobiles and his home. These warrants were declared invalid by the Supreme Court. Throughout the investigation, and before his arrest, defendant talked to the police several times and cooperated with them in answering questions. Defendant was arrested at his home. Subsequent to his arrest, his automobiles, parked in his private driveway, were seized and later searched at the police station on two occasions over a period of a year. The evidence obtained from these searches were vacuum sweepings of gun powder from one of the cars. The Supreme Court held that the search of defendant's cars without a warrant was unreasonable. In doing so, the court pointed out several facts, taken cumulatively, that proved the "automobile exception" did not apply.

First, the police had obtained invalid warrants and could hardly assert that it was an impractical necessity to require a warrant before going out and seizing and searching defendant's cars. In the present case, as we have already noted, requiring a warrant before the police went to defendant's residence would have been an impractical necessity since the police did not know beforehand that defendant's car would be where it was located and did not know for sure that defendant's car contained evidence of the crime until the police saw blood inside the car.

Second, in *Coolidge*, defendant knew for a long time that he was a suspect and had ample opportunity and ample reason to remove any evidence from his cars long before they were seized. Thus, there was some doubt whether the police even had probable cause to seize and search defendant's automobile. Furthermore, as pointed out by the court, the evidence that was found, gun powder, was hardly probative of the crime for which defendant was charged. In the present case, the defendant had not had ample time to remove evidence from the car, and police had clear probable cause to believe the automobile contained evidence of the crime for which defendant was charged.

Third, in *Coolidge*, defendant's automobiles were completely immobilized. Defendant was under arrest. The police transported his wife to another location and had no reason to believe that anyone else could obtain access to the automobiles. The police posted two guards to watch defendant's home, and these guards could easily have watched defendant's automobiles and prevented anyone from gaining access while a proper warrant was obtained, and thus, in *Coolidge*, there was not even the added inconvenience in assigning a special detail to watch the cars while a warrant was obtained. In the present case, the defendant's car was not completely immobilized, for the police did not know who else, including the possibility of defendant's sister, could have had access to the car. Also, the police would have been required to detach a special detail to watch defendant's car while a warrant to search was obtained.

Fourth, in *Coolidge*, the seizure of the automobile was itself declared invalid because the seizure required an intrusion onto defendant's private property. If the seizure had been proper, the decision in the case may well have been different. (See *Cooper v. California* (1967), 386 U.S. 58, 17 L. Ed. 2d 730, 87 S. Ct. 788.) In the present case, the seizure of defendant's automobile was proper and thus the analysis applied to the search in *Coolidge* is of doubtful applicability to the facts of this case.

■■ From the foregoing, it is clear that *Coolidge* is distinguishable from the present case. Since we believe that the present case is controlled by *Chambers v. Maroney*, we conclude that it would have been reasonable for the police to have conducted an immediate search on the scene, and thus the subsequent search was also reasonable. Consequently, we find defendant's motion to suppress the evidence found in his automobile was properly denied.

### III

Defendant next contends that the trial court erred in denying his motion in limine which requested the court to prevent the State from introducing into evidence the victim's hearsay statement, "William shot me." The State contends that the statement was properly admissible under either the "dying declaration" exception to the hearsay rule or the "spontaneous declaration" exception. Since we believe the deceased's statement was properly admitted as a dying declaration, we will confine our discussion to that exception to the hearsay rule.

■■ A dying declaration is a statement of fact by the victim concerning the cause and circumstances of his death. To be admissible into evidence as an exception to the hearsay rule, a dying declaration must appear to have been made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when the victim has despaired of life and looks to death as inevitable and at hand. (*People v. Odum* (1963), 27 Ill. 2d 237, 188 N.E.2d 720.) Before such a statement is allowed into evidence, the trial court must make an initial determination as to its admissibility and must be convinced, upon weighing all the facts and circumstances surrounding the declaration, that beyond a reasonable doubt all of the elements necessary for a dying declaration are present. (*People v. Tilley* (1950), 406 Ill. 398, 94 N.E.2d 328.) Also, the trial court must be convinced that the declarant was sufficiently possessed of his mental faculties as to be able to have accurately perceived, recollected and communicated the circumstances surrounding his death. *People v. Thomas* (1977), 49 Ill. App. 3d 961, 364 N.E.2d 641.

Defendant makes two arguments as to why the deceased's statement

was not a true dying declaration. He first contends the State failed to show, beyond a reasonable doubt, that the deceased believed his impending death was certain and that he had abandoned all hope of recovery. The deceased made the incriminating statement while he was being driven to the hospital by the testifying witness, Martin (the rescuer). The statement came shortly after the deceased had been shot four times, once in the head, and minutes before he was declared dead at the hospital. Moments after making the statement the deceased declared that he was dying. Because of these circumstances, we believe the trial court could have properly found that the deceased truly believed he was dying and his death was imminent. However, defendant points to the deceased's continuous pleading with Martin to run the red lights and get him to a hospital as showing that the deceased had not lost all hope of recovery.

To say that the declarant must have lost all hope of recovery is merely to say that the declarant must have truly believed he was dying and his death was imminent. To require that the declarant should have lost every scintilla of a hope of recovery would be to require the impossible.

■■ In most cases, a dying person will cling to whatever hope of recovery exists, no matter how unreasonable, even until his last desperate breath has expired. Thus, if we were to hold that the declarant is required to have absolutely no hope of recovery, no matter how unreasonable that hope is, we would have to hold that no such thing as a dying declaration exists. A statement should not be rejected as a dying declaration when only nebulous rays of hope exist. (*People v. Hubbs* (1948), 401 Ill. 613, 83 N.E.2d 289.) From the circumstances surrounding the deceased's statement in this case, we believe the trial court properly found that deceased believed he was dying and his death was imminent and, though deceased clinged to an unreasonable hope of recovery, such a nebulous ray of hope did not render the statement inadmissible.

Defendant next contends that the deceased's statement was inadmissible because the State failed to show he was in sufficient possession of his faculties to have accurately perceived, recollected and communicated the circumstances surrounding his imminent death. Testimony was presented to show that at the time of his death deceased had a substantial quantity of morphine in his blood and a trace of alcohol. A doctor testified that the amount of morphine, when considered together with the nature of deceased's wounds, would probably have substantially affected the ability of the deceased to understand what he was saying. However, this doctor also testified that the effect would not have been as substantial if the deceased was a constant user of heroin or morphine and had built up a tolerance to the drug, and there is evidence in the record to show that deceased had used heroin on frequent occasions prior to the day of his

death. Also, from Martin's testimony, it is clear that when Martin asked questions of the deceased, such as requesting his name or asking where he was shot, the deceased answered promptly and accurately and thus understood what was said to him and what he said to Martin. Consequently, we believe the trial court properly found that deceased was in sufficient possession of his faculties when he made the dying declaration.

Accordingly, we hold that defendant's motion in limine was properly denied and the statement of the deceased, "William shot me," was properly admitted into evidence.

## IV

Defendant's last contention is that the trial court committed reversible error in refusing to give his proposed jury instruction on circumstantial evidence. The instruction given at the request of the State was the first paragraph of Illinois Pattern Jury Instructions, Criminal No. 3.02, which reads:

> "Circumstantial evidence is proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict."

Defendant contends it was error not to include with this instruction its second paragraph, which reads:

> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

The committee note to this instruction says that the second paragraph should be given only when all the evidence is entirely circumstantial. Defendant contends all the evidence against him was circumstantial.

Generalizations aside, it is often difficult to draw a dichotomy between direct and circumstantial evidence. (*People v. Boose* (1978), 65 Ill. App. 3d 127, 382 N.E.2d 532.) In the present case, we will not attempt to resolve that dichotomy, for even assuming all of the evidence was circumstantial, the failure to give the second paragraph of the instruction was harmless error, if error at all, because, in light of the quantity and quality of all of the evidence against defendant, he suffered no prejudice from the failure to give his instruction.

For the reasons noted, we affirm the judgment of the trial court.

Affirmed.

ROMITI, P. J., and JOHNSON, J., concur.