THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. BENJAMIN STIFF et al., Defendants-Appellees.

Fifth District    No. 5—07—0189

Opinion filed March 23, 2009.

William A. Mudge, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Peterson, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Rita K. Peterson and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellee Benjamin Stiff.

Steven D. Griffin, of East Alton, for appellee Joey Ragusa.

JUSTICE SPOMER delivered the opinion of the court:

The defendants, Benjamin Stiff and Joey Ragusa, were charged separately with attempted murder (720 ILCS 5/8—4(a) (West 2004)), but the charges were upgraded to first-degree murder (720 ILCS 5/9—1(a)(1) (West 2004)) after the victim, James Garrison, died of his injuries. James was doused with gasoline, was set on fire, and died approximately seven weeks later. The State appeals from pretrial orders

of the circuit court of Madison County which found that the statements James had made to his partner, John Duich, and to the police, by which the defendants were implicated, failed to qualify under the excited-utterance/spontaneous-declaration or dying-declaration exceptions to the rule against hearsay. We affirm the orders to the extent that neither of James's statements qualified as a dying declaration. However, we reverse the finding that the statements did not qualify as excited utterances/spontaneous declarations, and we remand for further proceedings consistent with this decision.

## FACTS

Just after 2 a.m. on October 10, 2004, John Duich was awakened by James Garrison, whom Duich testified to be his "life partner." Although James lived approximately three houses away from Duich, they saw each other every day. When Duich awoke, he discovered that James was severely burned, lying across Duich's bed, and saying, "Johnny, help me, help me." Duich asked James what happened, and James responded that "they" threw gasoline on him and set him on fire. Duich asked who "they" were. According to Duich, James responded that it was Joey Ragusa and a large black man.

Duich explained that James had a drug problem and would sell items and use the money to purchase drugs. James would often forget that he had made the sale and later complain that his property had been stolen. Duich had seen James earlier in the evening, and they both had used crack cocaine. James broke out a basement window to gain entry to Duich's home. Duich testified that he is a heavy sleeper and did not hear James enter.

Duich called 9-1-1 at 2:22 a.m. to report the incident and request help. Duich testified that the 9-1-1 operator instructed him to ask James who had done this to him. Duich again asked and James again replied that it was Joey Ragusa and a big black man. A Wood River police officer arrived within five minutes.

Detective Darren Redden was the first to respond, and an ambulance arrived shortly thereafter. Upon his arrival, Redden found James on the bed. James was severely burned. Redden had been present at other burn scenes, but he had never seen a victim so badly burned while still alive. Redden said James was screaming and moaning in agony, saying, "God help me." James's hair was singed. His skin was still bubbling in some places and completely missing in others. Despite James's condition, Redden tried to gather information before the ambulance arrived.

Redden was adamant that no names of potential suspects were mentioned by James or Duich. Redden testified that James was

responsive despite his obvious agony and that he "answered every question directly after [Redden] asked the question, and the answers that he gave were substantiated by the interviews that followed." Redden specifically asked James who had done this to him, and according to Redden, James responded, "A white guy and a black guy that I met at Lisa Marshall's house." James explained, "They poured gasoline on me and caught me on fire." James said the white man was the one who had set him on fire and that "the white guy was driving a dark blue car, like a Corolla, that he parked right in front of Lisa's house." Because the State does not appeal that portion of the circuit court's order finding the victim's statement to Redden to be inadmissible, we do not consider its admissibility.

Redden went to Lisa Marshall's house after the ambulance arrived. Ragusa was taken into custody at 8 a.m. on October 10, 2004, and Stiff was taken into custody four days later. Redden returned to Duich's house and interviewed him a second time. According to Redden, Duich failed to give any specific names during the interview. It was not until approximately two months before the hearing that Redden became aware of Duich's claim that James had named Ragusa as the perpetrator. Redden was certain that Duich had not provided any names during the initial interviews.

James was taken to Alton Memorial Hospital and was subsequently airlifted to the burn unit at St. John's Mercy Hospital in St. Louis (St. John's). Duich testified that a nurse at Alton Memorial Hospital told him to prepare for the worst and that James had only 72 hours to live. Duich did not relay that information to James. Duich testified that he maintained hope that James would live, until $5^{1}/_{2}$ weeks after the incident, when Duich realized that James's injuries would prove fatal.

Dr. Peter Rumbolo, associate director of the burn unit at St. John's, testified that James had third-degree burns over 77% of his body, resulting in less than a 10% chance of survival. Neither Dr. Rumbolo nor his staff informed James about his prognosis, but Duich and his sister, Marla Shively, were made aware of it.

Dr. Rumbolo described James's treatment. Upon his arrival at the hospital, James was given medications for pain and anxiety, including morphine, Versed, and vecuronium, which was used to paralyze James's muscles, to promote the proper and efficient use of a ventilator. Dr. Rumbolo explained that paralytic medication is used to manage a patient's pain by allowing only minimal movement. Dr. Rumbolo further explained that the day after James arrived at the hospital, the pain medication was changed to fentanyl because of James's tolerance to medications. Drug testing was performed when James arrived at the hospital. The tests revealed that James had cocaine in his system and was legally intoxicated with a .085 blood-alcohol level.

On October 11, 2004, Duich and his sister, Marla, visited James, who was unable to speak because tubes were down his nose and throat. James was still receiving numerous drugs, including the paralytic, vecuronium. Nevertheless, Duich and Marla said James responded to them by squeezing their hands. Marla described herself as a religious person. She and Duich prayed over James. Marla told James to go to God so he would be out of pain.

On the morning of October 12, 2004, the vecuronium was discontinued so the police could attempt to question James. Detective Chris Johnson went to the hospital in the evening to conduct the interview, while another officer videotaped it. A nurse remained in the room to monitor James during the interview. The nurse said that James could respond to questions by nodding or shaking his head and appeared to be capable of answering reliably via this method. Dr. Rumbolo reviewed the videotape and testified that James appeared to be alert, his movements appeared to be purposeful, and he could respond to questions by shaking or nodding his head.

By the time the interview occurred at the hospital, Ragusa had already been arrested. When Detective Johnson asked James if Ragusa was the person who had set him on fire, James immediately nodded his head affirmatively. James shook his head no when asked if he knew the identity of the black man who had been with Ragusa. Detective Johnson testified that he did not ask James to identify the defendants from a photographic lineup because he did not think James was able to see.

James died on December 1, 2004, due to complications arising from the injuries he had sustained seven weeks earlier. The charges were then upgraded to first-degree murder. The defendants filed a motion *in limine* to exclude James's statements to Duich and Detective Johnson. A hearing was conducted on the defendants' motions and testimony was given over the course of several days. After hearing all the evidence, the circuit court ruled that James's statements to Duich and Detective Johnson identifying defendant Ragusa and a large black man as the perpetrators were not admissible as exceptions to the hearsay rule as either excited utterances/spontaneous declarations or dying declarations.

The circuit court found that the spontaneity required for the application of the excited-utterance/spontaneous-declaration exception to the hearsay rule was not present because the length of time between the incident and the statement was unknown and there was no evidence that James believed that the end was at hand, as required for a dying declaration. The State filed timely notices of appeal. We have consolidated the cases on appeal because the issues in each are identical.

## ANALYSIS

The State raises the following issues on appeal, which we have restated as follows: (1) whether James's October 10, 2004, statements to Duich at Duich's home or his October 12, 2004, statements to police during the interview at the hospital are admissible under the dying-declaration exception to the rule against hearsay and (2) whether James's October 10, 2004, statements to Duich are admissible under the spontaneous-declaration/excited-utterance exception to the rule against hearsay.

"The trial court's determination of whether a particular statement constitutes a dying declaration will not be reversed on appeal unless its findings are palpably contrary to the manifest weight of the evidence." *People v. Webb*, 125 Ill. App. 3d 924, 934 (1984). "A finding is against the manifest weight of the evidence if all reasonable and unbiased persons could agree an opposite conclusion is 'clearly evident.' " *People ex rel. Margolis v. Robb*, 225 Ill. App. 3d 843, 847 (1992), citing *Lyles v. Department of Transportation*, 183 Ill. App. 3d 901, 908 (1989).

The State contends that the circuit court erred by finding that James's alleged statement to Duich did not qualify as a dying declaration. The State insists that the injuries suffered by James were of such a nature and extent that he must have known he would not survive. We disagree with the State.

■ A dying declaration is admissible under an exception to the hearsay rule because there is a guarantee of trustworthiness due to the declarant's belief of impending death, which excludes the possibility of fabrication by the declarant. *People v. Georgakapoulos*, 303 Ill. App. 3d 1001, 1008 (1999). The following requirements must be present before a dying declaration will be admitted into evidence: (1) the declaration pertains to the cause or circumstances of the homicide, (2) the declarant possesses mental faculties sufficient to give an accurate statement about the circumstances of the homicide, and (3) the declarant believes that death is imminent. *Georgakapoulos*, 303 Ill. App. 3d at 1009. The party seeking to admit a dying declaration must show that at the time the statement was made, the declarant possessed " 'the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand.' " *People v. Webb*, 125 Ill. App. 3d 924, 934 (1984), quoting *People v. Tilley*, 406 Ill. 398, 403 (1950).

■ Applied to the victim's October 10, 2004, statement to Duich, the first requirement was met. James's statement to Duich implicat-

ing the defendants pertained to the cause and circumstances that led to his eventual death. Regarding the second requirement, James had all of his mental faculties at the time the alleged statement was made, although the defendants emphasize that Duich admitted that both he and James had ingested crack cocaine earlier in the evening. Drug tests administered at the hospital confirmed the presence of cocaine in James's system and showed that he had a blood-alcohol level of .085.

Nevertheless, evidence in the record reveals that James was not mentally impaired to the degree necessary to render the second requirement unsatisfied. James was able to make his way to Duich's home from Lisa Marshall's house, break through a basement window, and maneuver to Duich's bedroom to ask for help. Duich testified that James told him that Joey Ragusa and a big black man had set him on fire. Likewise, Detective Redden attested that in spite of his pain, James was responsive at Duich's house and capable of answering his questions directly. Moreover, those answers were later substantiated by interviews with other people. These facts indicate that James possessed mental faculties sufficient to give an accurate statement about the circumstances which led to his eventual death.

Although the first two requirements for the admission of a dying declaration were satisfied, the third was not. The record is devoid of evidence that James believed that his death was imminent at the time he made the statement to Duich.

In *People v. House*, 141 Ill. 2d 323 (1990), one of the victims, Kim Brooks, was found at the scene of an apartment fire with burns over approximately 40% of her body, and she later died of her injuries. Brooks had been interviewed when she was in the burn unit in critical condition, some 2 1/2 hours after her injuries were sustained. She was bandaged and clearly in pain. The *House* court concluded that, despite Brooks's injuries, there was nothing in the record which indicated that Brooks had been told she was going to die or that she had believed she was going to die. 141 Ill. 2d at 381. Thus, Brooks's statement to police did not qualify as a dying declaration. *House*, 141 Ill. 2d at 381.

In contrast, the victim in *People v. Rhoads*, 110 Ill. App. 3d 1107 (1982), specifically stated as follows: " 'I think I am going to die. Get me to the hospital. I think I am going to die.' " 110 Ill. App. 3d at 1110. The victim had sustained second- and third-degree burns over 60% of her body, plus first-degree burns over 20% of her body, and died approximately 19 hours after the fire as a result of her burns. *Rhoads*, 110 Ill. App. 3d at 1120. Medical personnel testified that the victim not only was able to answer all of their questions but also was alert and lucid at all times. *Rhoads*, 110 Ill. App. 3d at 1120.

The circumstances surrounding the victim's October 10, 2004, statement to Duich are similar to those in *People v. House*, 141 Ill. 2d 323 (1990). Although James suffered severe burns, he was able to make it to Duich's house to ask for help. James never said anything to indicate that he thought he was going to die. Other than the statement implicating the defendants, James's only additional words were, "Johnny, help me, help me." This does not imply that James thought he was going to die. Nothing in the record shows that James believed that death was imminent. Accordingly, it was not against the manifest weight of the evidence for the circuit court to conclude that James's statement to Duich did not qualify under the dying-declaration exception to the rule against hearsay.

■ The State also contends that James's October 12, 2004, videotaped statement to the police during the interview at the hospital was admissible as a dying declaration. Again, we disagree. Applying the above principles, we conclude there is no evidence that James believed that his death was imminent. Nobody told James that his death was near or inevitable. Although testimony indicated that James's chances for survival were slim, none of this was ever discussed with James.

James was treated for 7½ weeks before succumbing to his injuries. During this time, James never said he was going to die. Marla Shively testified that she prayed over James and told him to go to God. However, to satisfy the third requirement for the admission of a dying declaration, the *declarant* must believe that death is imminent. *Georgakapoulos*, 303 Ill. App. 3d at 1009. It is irrelevant what anyone else believes. The record fails to show that at the time the videotape was made, James had abandoned hope of living and believed that his death was certainly impending. Because all three requirements must be satisfied before a statement can be admitted as a dying declaration (*Georgakapoulos*, 303 Ill. App. 3d at 1009), we decline to analyze the other two requirements. The circuit court's finding that James's videotaped statement to the police at the hospital did not qualify under the dying-declaration exception was not against the manifest weight of the evidence, and thus we affirm that portion of the circuit court's order which excluded this statement from evidence.

The State's final contention on appeal is that James's October 10, 2004, statement to Duich was admissible as a spontaneous declaration/ excited utterance. The circuit court has considerable discretion in determining whether a statement is admissible as a spontaneous declaration, and its decision will not be reversed absent an abuse of that discretion. *People v. James*, 200 Ill. App. 3d 380, 388-89 (1990).

■ The requirements for admissibility under the spontaneous-declaration or excited-utterance exception to the hearsay rule are as follows: (1) the occurrence of an event sufficiently startling to produce a spontaneous and unreflecting statement, (2) the statement must relate to the circumstances of the occurrence, and (3) the absence of time to fabricate. *People v. Gacho*, 122 Ill. 2d 221, 241 (1988).

■ In this case, the first two requirements are easily met. James was doused with gasoline and set on fire, an event that is certainly sufficiently startling. See *People v. House*, 141 Ill. 2d 323, 381-86 (1990). The statement also related to the circumstances of the occurrence. The only remaining issue is whether there was an absence of time to fabricate.

Factors used to determine whether the declarant's statement was in fact spontaneous include the amount of time between the incident and the statement, the nature of the event, the mental and physical condition of the declarant, the presence or absence of self-interest, the distance traveled from the scene before making the declaration, the influences of intervening occurrences, and the nature and circumstances of the statement itself. *People v. Meras*, 284 Ill. App. 3d 157, 162 (1996). No one factor is determinative, because each case must rest on its own facts and must be judged from the totality of the circumstances surrounding the event. *People v. Smith*, 127 Ill. App. 3d 622, 627 (1984).

In this case, the defendants argue that the circuit court did not err by finding James's statement to Duich inadmissible as a spontaneous declaration/excited utterance because the statement lacked the requisite spontaneity and unreflective reaction. The circuit court emphasized that although James was severely injured, extremely excited, and in pain, the requirements necessary to admit the statement as an excited utterance were not fulfilled. The court specified that it was unknown how much time had elapsed between the incident and the statement. For this reason, the circuit court did not admit the statement as an excited utterance.

We disagree that the unknown amount of time between the incident and the statement rendered James's statement to Duich inadmissible. The appellate court's decision in *People v. Parisie*, 5 Ill. App. 3d 1009 (1972), negates such a notion. In *Parisie*, a tow truck driver found the victim lying alongside the road with a gunshot wound. A state trooper arrived on the scene approximately 30 minutes later and noted that the victim's shirt was covered with blood. The state trooper had a conversation with the victim, who answered the trooper's questions. The victim died the following morning. One of the issues in *Parisie* was whether the statements were admissible under

the spontaneous-declaration/excited-utterance exception to the hearsay rule. 5 Ill. App. 3d at 1026.

Similar to the instant case, it was unknown in *Parisie* how much time had passed between the incident and the statement. 5 Ill. App. 3d at 1031. Nevertheless, the appellate court held that the physical state of the victim yielded him incapable of fabrication, calculation, or deliberate design. *Parisie*, 5 Ill. App. 3d at 1031. The court noted as follows: "Spontaneity *** is a relative term and will vary under each set of circumstances, case by case. There can be no hard and fast rule in this area, and no precise yardstick of time can be established." *Parisie*, 5 Ill. App. 3d at 1028. "It is not the time element that controls, but the existence or lack of spontaneity in the light of the surrounding circumstances that is determinative." (Emphasis omitted.) *Parisie*, 5 Ill. App. 3d at 1028. The court stated further in *Parisie*, quoting from 1 F. Wharton, Criminal Evidence §281, at 643-45 (12th ed. 1955), as follows:

" 'The time which has elapsed since the event, and the distance which the declarant has traveled from the scene of the crime before making the declaration, is material in determining whether his declaration possesses the necessary spontaneity, but neither mere distance nor time are in themselves controlling. The court must determine whether under all the surrounding circumstances it is reasonable to believe that the declarant acted without thought, or whether there existed the possibility that the declarant has deliberated and made a false statement. If the court is convinced that the declaration springs from the event and not from calculation, the statement is admissible under the *res gestae* exception.' " *Parisie*, 5 Ill. App. 3d at 1029.

Likewise, in *People v. House*, 141 Ill. 2d 323 (1990), the Illinois Supreme Court noted, "Time is one factor, albeit an elusive one, whose significance will vary with the facts of each case." 141 Ill. 2d at 382. The victim in *House* made the statement at issue to a police officer, approximately 2½ hours after she had been set on fire. Although the officer testified that the victim was alert and responsive, the court held that this fact did not require exclusion because there was an absence of a motive to fabricate. *House*, 141 Ill. 2d at 385-86. The court found as follows: "[I]t is inconceivable that [the victim] spent the intervening time *** fabricating a story to tell police. The very nature of her injuries was such that the injuries undoubtedly commanded her full attention." *House*, 141 Ill. 2d at 384.

In this case, it is unknown how much time elapsed between the time James was set on fire and the time he made the statement to Duich. However, we do know that James was set on fire at Lisa Mar-

shall's residence. Using Google Maps, we take judicial notice (see *Hoskin v. Union Pacific R.R. Co.*, 365 Ill. App. 3d 1021, 1024-25 (2006)) that the distance between Lisa Marshall's residence and Duich's residence is 295 feet. Google Maps, http://www.maps.google.com (last visited August 12, 2008). While it is unknown precisely how much time had passed between the incident and the statement, it was obviously not extensive. James traveled less than the length of a football field to get to Duich. When Detective Redden arrived shortly thereafter, James's skin was still bubbling and he was screaming in agony. More than 77% of his body had been burned. Redden had never seen a victim live through such extensive injuries. Under the totality of the circumstances, the magnitude of James's injuries commanded his full attention, and we find it inconceivable that James spent the intervening time concocting a story. See *House*, 141 Ill. 2d at 384; see also *Parisie*, 5 Ill. App. 3d at 1031. Accordingly, we find that the circuit court abused its discretion by failing to admit James's statement to Duich under the excited-utterance/spontaneous-declaration exception to the rule against hearsay.

## CONCLUSION

For the foregoing reasons, we affirm that portion of the order of the circuit court which determined the victim's October 12, 2004, statement to police to be inadmissible, but we reverse that portion of the order which found the victim's October 10, 2004, statement to Duich to be inadmissible.

Affirmed in part and reversed in part; cause remanded.

GOLDENHERSH and STEWART, JJ., concur.