SECOND DIVISION
DECEMBER 29, 2009

1-07-1769

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 17920 |
| | ) | |
| DERRICK HATCHETT, | ) | Honorable |
| | ) | Thomas Sumner, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE CUNNINGHAM delivered the modified opinion of the court upon denial of petition for rehearing:

Following a bench trial in the circuit court of Cook County, defendant Derrick Hatchett was convicted of first-degree murder and sentenced to 45 years of imprisonment. On appeal, the defendant argues that: (1) he was denied a fair trial when the trial court admitted the decedent's statement as an excited utterance and/or dying declaration; (2) he was denied a fair trial when the trial court permitted the handwritten statement of a testifying witness, Tron Johnson, to be introduced as substantive evidence; (3) he was denied a fair trial when the trial court refused the defense counsel's requests to recall Tron Johnson and for a one-day continuance to secure witnesses; (4) the defendant was denied effective assistance of counsel; and (5) the defendant's guilt was not proven beyond a reasonable doubt. For the following reasons, we affirm.

BACKGROUND

On September 22, 2003, Patrick Taylor was shot multiple times on South Lowe Avenue in Chicago, Illinois. Taylor died of his injuries the next day. In 2004, the defendant and Arthur Foote

were charged with first-degree murder and aggravated battery of Taylor.[1]

Prior to trial, the defendant filed a motion to quash arrest and a motion to suppress statement. On May 3, 2006, the trial court denied the defendant's motion to quash his arrest, but granted the motion to suppress his statement, finding that inexplicable injuries which the defendant sustained while in police custody showed that the defendant's confession was a product of coercion. The defendant's and Foote's cases were eventually severed and the defendant waived his right to a jury trial.

On March 6, 2007, a bench trial was held during which several witnesses gave the following testimony. Terry Davis testified that on September 22, 2003, at approximately 10 p.m., he was selling marijuana on the 5700 block of South Lowe Avenue when he heard approximately 10 gunshots coming from several cars parked down the street. Davis then immediately saw a man, who was later identified as Taylor, running toward him on South Lowe Avenue and being chased by three vehicles–a 2001 white Chevy Impala (white car), followed by a silver Dodge Stratus (silver car) and a maroon Tahoe sport utility vehicle (maroon SUV). Davis noticed that Taylor was wearing jeans and a white jersey with some blood spots on it. As Taylor ran west onto 57th Street, Davis saw the white car "jump the curb" and hit Taylor, who then fell, stood up and started running again. The maroon SUV then also struck Taylor. At this point, Davis hid in a "gangway" and saw Taylor run past him. Davis stated that he lost sight of Taylor after Taylor ran past him, but heard 6 to 8 more

---

[1]Counts I to V of the indictment charged both the defendant and Foote with first-degree murder. Counts VI to VII of the indictment charged the defendant with first-degree murder. Counts VIII to IX of the indictment charged the defendant with aggravated battery.

gunshots following the chase. Davis did not see who shot Taylor. Once Davis emerged from the gangway, he observed Taylor lying on the ground in front of Maurice Fields' house and noted that the cars were nowhere in sight.

Maurice Fields testified that he resided at 5733 South Lowe Avenue. On the evening of September 22, 2003, Fields was home when he heard three or four gunshots. Fields observed a man, later identified as Taylor, lying on the ground in front of Fields' house and being punched by a black man. However, Fields neither witnessed anyone fire the gunshots nor observed the presence of any vehicles in front of his home. Fields then walked onto his front porch and yelled at the man to stop beating Taylor, after which the perpetrator ran away and Fields called the police.

Sergeant John Ryan (Sergeant Ryan) of the Chicago police department testified that on September 22, 2003, he responded to a "call of a man shot" on the 5700 block of South Lowe Avenue. When he arrived at the scene, he saw Taylor sitting on the sidewalk against a fence with his eyes closed. Sergeant Ryan noticed that Taylor had at least one gunshot wound to his face, was bleeding from numerous spots on his face, had a large bloodstain on his chest, and had shallow breathing. Sergeant Ryan testified that when he asked Taylor what had happened, Taylor replied that "they shot me." When Sergeant Ryan asked Taylor who shot him, Taylor responded, "Quick and Little Ride." Taylor also asked Sergeant Ryan if he was "going to die." Sergeant Ryan's conversation with Taylor lasted less than 30 seconds, after which paramedics arrived to provide medical treatment for Taylor. Over defense counsel's hearsay objections, the trial court admitted Taylor's statements regarding the identities of the shooters as either an excited utterance or a dying declaration.

Debra Taylor, the mother of the victim Taylor, testified that the defendant's nickname was "Little Ride," and that Foote's nickname was "Quick." She stated that she knew these men through her son, who "started hanging out with them" about a year and a half prior to his murder.

Tron Johnson testified at trial that on the night of September 22, 2003, he was in the company of the defendant, Foote, and two other individuals introduced to Johnson as "Cake"[2] and "Polo." Johnson stated that the defendant, Foote and Taylor rode in a white car, while he and Polo followed in a separate vehicle. After visiting a restaurant, the five men drove to a concert in downtown Chicago. However, because the venue was crowded, the men did not stay for the concert and instead drove around the city. Johnson stated that he was intoxicated that night, and at some point he fell asleep in the car while Polo drove. He later awoke in the car to "some gunshots being let off by some guys off the porch." He stated that by that time, the car in which he was riding was parked on a neighborhood street near the white car and a truck. Johnson denied seeing the defendant and Foote fire any weapons, but only saw them standing by the white car. He testified that the defendant and Foote fled after hearing the gunshots, and that he did not see Taylor at that time.

At this point in the trial, the State impeached Johnson with a prior written statement that Johnson made to the police and Assistant State's Attorney Michele Popielewski (ASA Popielewski) in January 2005. In the written statement, Johnson stated that on the night of the shooting, the five men drove around the city in separate cars as described above. Johnson fell asleep in the "gray Buick" while Polo drove, and Johnson was startled awake when Polo suddenly stopped the car. At

---

[2]Patrick Taylor's nickname was "Cake."

that point, Johnson noticed that they were parked in a residential neighborhood behind the white car. Johnson then immediately heard gunfire and saw that "Quick was shooting a semiautomatic handgun at Taylor outside the white Impala." Johnson further stated that Quick shot at Taylor between 8 to 12 times, and that "Lil Ride was also out of the [white] Impala [with] a semiautomatic gun in his hand." When Polo began steering the gray Buick away from the scene, Johnson noticed "Lil Ride start to run down the street chasing after [Taylor] and Quick," and heard "about five more shots." At that moment, Johnson saw Lil Ride running "with the gun extended" and shooting at Taylor. Taylor, who was then about a half a block down the street, fell to the ground in front of a house.

At trial, Johnson insisted that he was telling the truth on the witness stand and that his prior inconsistent statement implicating the defendant was only made out of fear that he would also be charged with the crime. On cross-examination, Johnson testified that he was prompted to lie about the identities of the shooters in his prior written statement because the police had shown him "something" with his name on it and that "something" was a "lie."

Forensic investigator Joseph Dunigan also testified on behalf of the State. On the night of September 22, 2003, Dunigan responded to a shooting investigation and found a total of 17 spent cartridges, an empty gun magazine, and fired bullets from semiautomatic weapons in a trail leading from the 5600 block to the 5700 block of South Lowe Avenue. Further, he testified that there was a trail of blood leading southbound from the 5650 to the 5700 areas of South Lowe Avenue.

Marc Pomerance, a forensics scientist who specialized in firearms, testified that based on the firearms evidence, at least two different guns were used in the shooting. He determined that it was unlikely that the shooters fired their weapons while standing still in one location because some of

5

the cartridges were found more than 5 to 10 feet apart, which was the typical range of distance a firearm could eject a cartridge case.

Chad Meunier, a loss control manager at Enterprise Rent-A-Car, testified that on September 15, 2003, an individual named Sharon Grady rented a white Chevy Impala from the company. Foote was listed as a second driver on the vehicle. He stated that on September 23, 2004, the vehicle was returned with damage to the rear left bumper and the "front left quarter panel."

By stipulations, the parties agreed that DNA evidence obtained from a baseball cap found at the crime scene excluded the defendant. The parties also agreed that on September 24, 2003, Dr. Lawrence Cogan (Dr. Cogan), a medical examiner in the Cook County medical examiner's office, performed Taylor's autopsy. Based on the autopsy, Dr. Cogan opined that Taylor died as a result of multiple gunshot wounds to his body–including Taylor's neck, face, back, right upper arm, abdomen, left buttocks, thighs and genitals. Other injuries also included abrasions, lacerations, hemorrhaging, and skull fractures. Dr. Cogan concluded that the manner of death was homicide.

The State then sought to admit Johnson's prior written statement as substantive evidence, which the trial court granted, over the objections of defense counsel. Defense counsel then requested that Johnson be recalled to the witness stand for the purpose of clarifying what the police showed Johnson during interrogation, which Johnson claimed had prompted him to lie in his written statement. The trial court denied defense counsel's request to recall Johnson. The State then rested and the trial court denied defense counsel's motion for directed verdict.

After the State rested, defense counsel requested that a one-day continuance be granted. The trial court denied the request for a continuance and granted a 10-minute recess.

Following the 10-minute recess, the defendant testified on his own behalf. He stated that on September 22, 2003, he and Taylor were passengers of a white Chevy Impala driven by Foote. The three men were accompanied by Johnson and Polo, who drove behind them in a separate car. The defendant testified that the group purchased liquor before heading to a concert, but did not stay for the concert because it was too crowded. Subsequently, the men drove to a gas station for some "blunts." While at the gas station, the defendant noticed an orange SUV and decided to rob it. Consequently, the group, still driving in two separate vehicles, followed the SUV to a residential neighborhood. The defendant stated that once the SUV stopped and parked, the group parked about a block away. At that point, the defendant, Foote and Taylor exited the white car. According to the defendant, Taylor, armed with a gun, started approaching the SUV with the defendant and Foote following. According to the defendant, neither he nor Foote was armed. As the three men approached the SUV, gunshots rang out. The defendant stated that he fled on foot and eventually hitched a ride with a gentleman in exchange for $50. The defendant stated that he did not see Taylor get killed and denied having any arguments with Taylor on the night of the murder.

The trial court then found the defendant guilty of first-degree murder. Subsequently, the trial court denied the defendant's motion for a new trial and sentenced the defendant to 45 years in prison. On June 22, 2007, a notice of appeal was filed before this court. On August 22, 2007, the trial court issued an order granting a motion to amend the notice of appeal to "reflect the correct judgment date" of June 1, 2007. Subsequently, an amended notice of appeal was filed before this court.

ANALYSIS

We determine the following issues: (1) whether Taylor's statement to Sergeant Ryan was

7

properly admitted as a dying declaration or an excited utterance; (2) whether Johnson's prior inconsistent statement was properly admitted as substantive evidence and whether the defendant's request to recall Johnson was properly denied; (3) whether the trial court properly refused the defendant's request for a one-day continuance; (4) whether the defendant was denied effective assistance of counsel; and (5) whether the defendant's guilt was proven beyond a reasonable doubt.

We first determine whether Taylor's statement to Sergeant Ryan, which identified the shooters as "Quick and Little Ride," was properly admitted as a dying declaration or an excited utterance exception to hearsay evidence. The defendant argues that Taylor's statement identifying his shooters was not a dying declaration because the evidence suggested that Taylor did not believe death was imminent and that it was uncertain whether Taylor had sufficient mental faculties to provide an accurate statement about the circumstances of his death.

Deference is given to a trial court's determination to admit a statement as a dying declaration exception to hearsay, and a reviewing court will not overturn the decision unless it is "palpably against the manifest weight of the evidence." People v. Graham, 392 Ill. App. 3d 1001, 1005, 910 N.E.2d 1263, 1268 (2009), quoting People v. Gilmore, 356 Ill. App. 3d 1023, 1033-34, 828 N.E.2d 293, 303 (2005). Such a finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident. People v. Stiff, 391 Ill. App. 3d 494, 499, 904 N.E.2d 1174, 1179 (2009).

"A dying declaration qualifies as a hearsay exception because it is considered trustworthy where the likelihood of fabrication is minimal due to the declarant's belief that death is imminent." Graham, 392 Ill. App. 3d at 1006, 910 N.E.2d at 1268; Stiff, 391 Ill. App. 3d at 499, 904 N.E.2d at

1179. A statement is admitted as a dying declaration when it is shown beyond a reasonable doubt that: "(1) the declaration pertains to the cause or circumstance of the homicide; (2) the declarant must believe that death is imminent; and (3) the declarant must possess mental faculties sufficient to give an accurate statement about the circumstances of the homicide." People v. Georgakapoulos, 303 Ill. App. 3d 1001, 1009, 708 N.E.2d 1196, 1203 (1999).

The parties do not dispute that the first prong of the dying declaration requirements is satisfied because Taylor's statement regarding the identities of his shooters pertained to the cause or circumstance of the murder.

The second prong requires that the declarant believe death is imminent. The defendant argues that Taylor lacked the belief that death was imminent because Taylor asked Sergeant Ryan at the crime scene whether he was going to die. The defendant also points out that the trial court, in listing the requirements for a dying declaration, erroneously stated that it must be demonstrated that the declarant was cognizant of the fact that he *may* be dying. The State, on the other hand, argues that the second prong was established because Taylor was shot multiple times and bleeding to death, and that Taylor's question about whether he was going to die highlighted Taylor's belief of impending death. We agree.

"Belief in the imminence of death may be shown by the declarant's own statements or from circumstantial evidence, such as the nature of the wounds or statements made in his presence." Georgakapoulos, 303 Ill. App. 3d at 1009, 708 N.E.2d at 1204. "Proof of such a belief can be established by any adequate method of communication, whether by words or signs." Georgakapoulos, 303 Ill. App. 3d at 1010, 708 N.E.2d at 1204. In People v. Lawson, the victim was

9

shot nine times and was lying in a ravine when police arrived. People v. Lawson, 232 Ill. App. 3d 284, 287, 596 N.E.2d 1235, 1238 (1992). The victim made statements such as, " 'Help me, I'm dying. I've been shot in the back. Get me out of here. You need to get me out of here' " and " 'Bryan Lawson did this to me.' " Lawson, 232 Ill. App. 3d at 287, 596 N.E.2d at 1238. In challenging the admission of the victim's statement identifying the defendant as the perpetrator, the defendant argued that the victim's "get me out of here" statements showed that "he had not given up hope for his survival nor despaired of life." Lawson, 232 Ill. App. 3d at 292, 596 N.E.2d at 1241. The reviewing court upheld the admissibility of the statement as a dying declaration, finding that it was reasonable to conclude that the victim "knew of the seriousness of his condition" because the victim was shot nine times with "powerful handguns" and was bleeding to death at the time he made the statement. Lawson, 232 Ill. App. 3d at 293, 596 N.E.2d at 1242. Further, the reviewing court held that the mere fact that the victim had some "nebulous rays of hope" of recovery did not negate the victim's belief of imminent death. Lawson, 232 Ill. App. 3d at 293, 596 N.E.2d at 1242; see also People v. Davis, 93 Ill. App. 3d 217, 232, 416 N.E.2d 1197, 1208 (1981) (where the victim was shot four times, once in the head, and mentioned that he was dying, victim had an imminent belief of death despite repeatedly asking the driver to run the red lights en route to the hospital).

Here, it was reasonable to conclude that Taylor knew of the seriousness of his condition because he was shot multiple times with at least two semiautomatic weapons, resulting in gunshot wounds to vital areas of his body such as his neck, face, back, and abdomen. Evidence also suggested that Taylor was struck by two vehicles during the chase. When Sergeant Ryan arrived at the scene, Taylor was sitting on a sidewalk, bleeding, and leaning against a fence with his eyes

closed. Under these circumstances, we find that it was reasonable for the trial court to find that Taylor believed death was imminent, and the mere fact that he asked Sergeant Ryan if he was going to die did not negate such belief. It is unlikely that a person who did not believe he was dying would pose such a question to anyone. But *cf.* Stiff, 391 Ill. App. 3d 494, 904 N.E.2d 1174 (burn victim did not believe death was imminent where the victim walked to seek help, was never told of his slim chance of survival, and was hospitalized for over seven weeks before succumbing to his injuries). Thus, we find that Taylor believed death was imminent and the second prong of the dying declaration requirements was met.[3]

The third prong requires that the declarant possess mental faculties sufficient to give an accurate statement about the circumstances of the homicide. The defendant argues that the extent of Taylor's injuries called into question his ability to speak coherently to Sergeant Ryan. The defendant also argues that defense counsel should have introduced Taylor's medical records and the testimony of Taylor's treating paramedics at trial in order to provide more information to the trial court regarding Taylor's physical condition. The State, however, argues that Taylor possessed sufficient mental faculties to establish the third prong of the dying declaration requirements because Taylor was able to answer Sergeant Ryan's open-ended questions in a coherent manner. The State further contends that accepting the notion that a seriously injured victim could not be sufficiently lucid for the purpose of a hearsay analysis would lead to the absurb result that no dying declaration

---

[3]We recognize that the trial court could have been clearer in listing the second requirement of a dying declaration. However, we need not address this issue in light of our finding that Taylor believed death was imminent.

exceptions would ever apply. We agree.

In determining whether a declarant possessed mental competency to give an accurate statement, a trial court may consider whether he was able to answer questions about the incident. See People v. Rhoads, 110 Ill. App. 3d 1107, 1120, 443 N.E.2d 673, 683 (1982); Davis, 93 Ill. App. 3d at 232-33, 416 N.E.2d at 1208-09 (declarant had sufficient mental faculties where he was able to answer questions promptly and accurately, despite suffering from four gunshot wounds and having substantial levels of morphine and alcohol in his blood). Moreover, questions requiring "more than a simple yes or no answer" may be a factor in assessing whether a declarant possessed sufficient mental faculties. See People v. Barnes, 117 Ill. App. 3d 965, 970, 453 N.E.2d 1371, 1377 (1983).

In the instant case, Taylor was able to answer all of Sergeant Ryan's open-ended questions at the crime scene. When asked what had happened, Taylor replied that "they shot me." When Sergeant Ryan asked who shot him, Taylor responded, "Quick and Little Ride." Although there was testimony to suggest that Taylor may have been drinking on the night of the shooting, evidence showed that Taylor understood all of Sergeant Ryan's questions and answered them promptly. Further, Sergeant Ryan testified that Taylor's answers to his questions were coherent. We disagree with the defendant's argument that Taylor's medical records and testimony of the paramedics were necessary to establish the sufficiency of Taylor's mental competency. The paramedics arrived at the scene after Taylor's statements were made to Sergeant Ryan and treated Taylor for approximately 15 minutes before transporting Taylor to the hospital. Testimony by the paramedics would not necessarily have been accurate to reflect Taylor's mental faculties minutes earlier when he spoke with Sergeant Ryan. Because it is reasonable to conclude that the condition of a seriously injured

12

victim could dramatically change within minutes, we do not find that the absence of testimony by the paramedics or Taylor's medical records regarding Taylor's condition at the time of the arrival of the paramedics provided a basis for a claim of ineffective assistance of counsel.

Moreover, as the State argues, accepting the notion that a seriously injured victim could not be sufficiently lucid for the purpose of a hearsay analysis would lead to the absurb result that no dying declaration exceptions would ever apply since these statements are always made after the declarant has been seriously injured and the circumstances are such that death is likely imminent. Thus, although Taylor was seriously wounded, we find that the trial court could find beyond a reasonable doubt that Taylor possessed sufficient mental faculties to give accurate statements to Sergeant Ryan about the circumstances.

The defendant also argues that the police report produced following the incident did not indicate that Taylor claimed "Little Ride" was responsible for the shooting; rather, it stated that "Quick and Lil *Red*" shot Taylor.

We disagree that this discrepancy automatically called into question the defendant's involvement in the crime, in light of the evidence presented at trial. Sergeant Ryan testified that Taylor named "Quick and Little Ride" as the shooters. Both Foote and the defendant–namely, Quick and Little Ride–were in the company of Taylor on the night of the murder. Moreover, the police report was not prepared by Sergeant Ryan, who had first-hand knowledge of Taylor's statements. Thus, we find that Taylor possessed the mental faculty sufficient to give an accurate statement about the circumstances of the homicide and the third prong of the requirements was satisfied.

Therefore, we find the trial court's admission of Taylor's incriminating statement against the

13

defendant as a dying declaration exception to the hearsay rule was not against the manifest weight of the evidence. Moreover, the admission of Taylor's dying declaration did not violate the defendant's rights to confrontation under the sixth amendment. See Graham, 392 Ill. App. 3d at 1008, 910 N.E.2d at 1270; Gilmore, 356 Ill. App. 3d at 1033, 828 N.E.2d at 302; see also People v. Ingram, 382 Ill. App. 3d 997, 1003-04, 888 N.E.2d 520, 525 (2008).

Because we hold that Taylor's statement identifying the defendant as one of his shooters was properly admitted as a dying declaration exception to hearsay evidence, we need not address whether that statement was also properly admitted as an excited utterance.

We next determine whether Johnson's prior inconsistent statement was properly admitted as substantive evidence at trial and whether the defendant's request to recall Johnson to the witness stand was properly denied.

The defendant argues that Johnson's prior written statement implicating the defendant as one of the shooters should not have been admitted because Johnson denied having any knowledge of the murder until he provided the written statement at issue to the police, and the trial court improperly limited defense counsel's cross-examination by refusing to allow the defense to recall Johnson to the witness stand. We disagree.

An evidentiary ruling will not be disturbed by a reviewing court absent an abuse of discretion. People v. Franklin, 135 Ill. 2d 78, 96, 552 N.E.2d 743, 751 (1990). Section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) states in pertinent part:

> "In all criminal cases, evidence of a statement made by a
>
> witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement--

\*\*\*

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

\*\*\*

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding." 725 ILCS 5/115-10.1 (West 2006).

Here, the defendant does not dispute that subsections (a) and (c)(2) of section 115-10.1 were satisfied. Rather, he argues that the cross-examination portion under subsection (b) was not met. The record shows that Johnson testified that on the night of the murder, he awakened to the sound of gunshots from a neighborhood porch, but denied seeing the defendant fire any weapons. At that

point in the trial, the State impeached Johnson with a prior written statement, in which Johnson stated that he saw the defendant chase Taylor while pointing a semiautomatic weapon at Taylor. The record shows that defense counsel then cross-examined Johnson, during which Johnson claimed that his prior written statement was false and that he lied about the identities of the shooters for fear that he would also be charged with the crime. On re-cross-examination, Johnson stated that the assistant State's Attorneys were "trying to persuade me about something that I knew wasn't true" and stated that he lied in the prior written statement under police coercion. At no point did the trial court restrict the scope of defense counsel's cross-examination and re-cross-examination of Johnson. Further, the record shows that during a pretrial hearing, the trial court clearly stated that Johnson's prior inconsistent statement could be used for substantive or impeachment purposes, and thus, we must assume that defense counsel knew or should have known the law and was on notice that the evidence could have been used by the State for either or both of those purposes. Thus, because defense counsel had the opportunity to fully cross-examine and re-cross-examine Johnson regarding the prior inconsistent statement and had notice that such statement could be used for impeachment or substantive purposes, the defendant cannot now claim that the trial court limited his right to cross-examination. Therefore, we find that the cross-examination requirement under section 115-10.1 was met and the trial court did not abuse its discretion in admitting the prior inconsistent statement as substantive evidence.

Nevertheless, the defendant argues that the State's "delay" in waiting until the end of its case-in-chief to introduce Johnson's prior written statement warranted the recall of Johnson for the purpose of developing his testimony regarding the circumstances that induced him to lie. We

16

disagree.

It is within the trial court's discretion to determine whether to allow a witness to be recalled. See People v. Lewis, 223 Ill. 2d 393, 405, 860 N.E.2d 299, 306 (2006).

Here, Johnson had already testified on the witness stand two hours prior to defense counsel's request to recall him. According to the State, Johnson was already on his way back to the correctional facility where he was being detained for an unrelated crime. As discussed above, because defense counsel had already been given unlimited latitude to cross-examine and re-cross-examine Johnson regarding what prompted him to lie about the identities of the shooters in the prior written statement, any further questioning on the issue would have been repetitive. See People v. Morando, 169 Ill. App. 3d 716, 723, 523 N.E.2d 1061, 1067 (1988) (trial court has the discretion to prevent repetitive cross-examination). We also note that it was within the State's tactical purview to seek admission of Johnson's prior written statement during any point in its case-in-chief, and the defendant has provided no authority to support his argument that it was improper for the State to seek admision of the evidence at the end of its case-in-chief. Therefore, we find that the trial court exercised proper discretion in denying the defendant's request to recall Johnson.

We next determine whether the trial court properly refused the defendant's request for a one-day continuance.

The defendant argues that the trial court did not properly balance the defendant's right to call witnesses on his own behalf against the interest of judicial economy when it denied the defendant's request for a continuance to secure witnesses.

The State argues that the issue is forfeited to the extent the defendant argues that the trial

17

court erred in denying his continuance to "secure witnesses," because the defendant's motion for a new trial only alleged the trial court's failure to grant the defendant a continuance to "locate and recall [Johnson]."

For the reasons discussed above, the defendant was not entitled to a continuance to locate and recall Johnson. We also find that the defendant has forfeited review of this issue as it relates to securing other testifying witnesses because he failed to raise this claim in a posttrial motion. See People v. Woods, 214 Ill. 2d 455, 470, 828 N.E.2d 247, 256-57 (2005). However, the plain error doctrine gives a narrow and limited exception to a reviewing court to consider certain forfeited errors. People v. Herron, 215 Ill. 2d 167, 177, 830 N.E.2d 467, 474 (2005). The plain error doctrine allows this court to review unpreserved issues when either:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." People v. Piatkowski, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).

The first step in a plain error analysis is to determine whether an error occurred at all. People v. Hudson, 228 Ill. 2d 181, 191, 886 N.E.2d 964, 971 (2008).

Absent a clear abuse of discretion, a reviewing court will not disturb a trial court's ruling to

18

grant or deny a continuance. People v. Walker, 232 Ill. 2d 113, 125, 902 N.E.2d 691, 697 (2009). Section 114-4(f) in the Code states that "a reasonably brief continuance may be granted to either side in the interests of justice" after trial has begun. 725 ILCS 5/114-4(f) (West 2006). No "mechanical test" exists to determine when the denial of a continuance for judicial economy violates a defendant's right to defend. Walker, 232 Ill. 2d at 125, 902 N.E.2d at 697. Factors a court may consider include "the movant's diligence, the defendant's right to a speedy, fair and impartial trial and the interests of justice." Walker, 232 Ill. 2d at 125, 902 N.E.2d at 697. "Other relevant factors include whether [defense counsel] was unable to prepare for trial because he or she had been held to trial in another cause (725 ILCS 5/114-4(b)(2) (West 1994)), the history of the case (People v. Coleman, 203 Ill. App. 3d 83, 100, 560 N.E.2d 991, 1003 (1990)), the complexity of the matter (People v. Nickols, 41 Ill. App. 3d 974, 979, 354 N.E.2d 474, 479 (1976)), the seriousness of the charges (People v. Hamilton, 17 Ill. App. 3d 740, 742, 308 N.E.2d 216, 217 (1974)), as well as docket management, judicial economy and inconvenience to the parties and witnesses." Walker, 232 Ill. 2d at 125-26, 902 N.E.2d at 697.

Here, the defendant requested a continuance after the State had rested and the trial court had denied the defendant's motion for a directed finding. We note that the defendant did not initially specify why he wanted a continuance. Defense counsel did not inform the trial court that he was unprepared for trial nor that despite due diligence he was unable to secure the presence of defense witnesses. In fact, it was only after the trial court asked how many defense witnesses would be testifying did defense counsel say that the defendant would be the defense's only witness. The trial court then correctly stated that it would not delay the proceedings, and pointed out that a demand for

trial "means you're ready." Without much information provided regarding the alleged potential defense witnesses, the trial court could well have concluded that the defendant's request was an unreasonable delay in the trial proceedings. Thus, we find that the trial court did not err in denying the defendant's request for a continuance and the plain error doctrine does not apply to reach the forfeited issue.

Next, we determine whether the defendant was denied effective assistance of counsel.

The defendant argues that defense counsel was acting under a conflict of interests by representing both the defendant and Foote during the pretrial proceedings. Specifically, he argues that defense counsel's dual representation impeded the State from making a plea offer that would have benefitted one defendant against the interest of the other.

To successfully establish a claim of ineffective assistance of counsel, the defendant: (1) must prove that the attorney's performance fell below an objective standard of reasonableness so as to deprive him of the right to counsel under the sixth amendment (performance prong); and (2) that this substandard performance resulted in prejudice (prejudice prong). Strickland v. Washington, 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-97, 104 S. Ct. 2052, 2064-68 (1984). To prove prejudice, the defendant must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " People v. King, 316 Ill. App. 3d 901, 913, 738 N.E.2d 556, 566 (2000), quoting People v. Haynes, 192 Ill. 2d 437, 473, 737 N.E.2d 169, 189 (2000). A reasonable probability is one that sufficiently undermines confidence in the outcome. King, 316 Ill. App. 3d at 913, 738 N.E.2d at 566. The defendant must satisfy both prongs to prevail on his claim of ineffective assistance of counsel. However, a reviewing court may

analyze the facts of the case under either prong first, and, if it deems that the standard for that prong is not satisfied, it need not consider the other prong. People v. Irvine, 379 Ill. App. 3d 116, 129-30, 882 N.E.2d 1124, 1136-37 (2008).

We find that this issue is not appropriate for resolution in the context of this direct appeal. Rather, this issue should be appropriately raised in a postconviction proceeding in which the defendant could submit affidavits and present extrinsic evidence at a hearing to determine whether a conflict of interests existed in his trial representation. This is exactly the type of issue that the postconviction proceedings, set forth in case law and statutory provisions, is intended to address. Thus, we will not address the issue of a conflict of interests any further.

The defendant also makes a number of other arguments to support his claim for ineffective assistance of counsel. To the extent that these arguments relate to defense counsel's failure to challenge Taylor's mental faculties and the discrepancy in the police report, we find that the performance prong under Strickland was not satisfied, for the reasons discussed above. Likewise, the defendant's argument that defense counsel was ineffective for failing to present any witnesses at trial is also without merit. Here, the defendant testified on his own behalf at trial, giving his version of the events that occurred on the night at issue. The defendant has not shown how defense counsel's performance fell below an objective standard by not presenting more witnesses, particularly where the State carried the burden of proof. Therefore, we find that neither prong was satisfied under Strickland and the defendant did not establish the necessary facts to support his claims of ineffective assistance of counsel.

Finally, we determine whether the defendant's guilt was proven beyond a reasonable doubt.

The defendant argues that there was insufficient evidence to support his conviction for first-degree murder because eyewitnesses to the crime were unable to identify the perpetrators and the only evidence against the defendant were Taylor's statement to Sergeant Ryan and Johnson's recanted prior written statement.

When the sufficiency of the evidence is challenged on appeal, we must determine " 'whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) Graham, 392 Ill. App. 3d at 1008-09, 910 N.E.2d at 1271, quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is within the trier of fact's province "to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence." Graham, 392 Ill. App. 3d at 1009, 910 N.E.2d at 1272. A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." Graham, 392 Ill. App. 3d at 1009, 910 N.E.2d at 1271.

In the case at bar, Taylor's statement to Sergeant Ryan, which was appropriately admitted as a dying declaration, was singly sufficient to convict the defendant of first-degree murder. Further, Taylor's statement was corroborated by Johnson's prior written statement to the police, which stated that the defendant chased Taylor with a semiautomatic weapon in hand. The trails of blood and spent cartridges found at the crime scene also corroborated witness testimony of the chase. In reviewing the evidence, the trial court was free to believe Johnson's prior inconsistent statement and Taylor's dying declaration, rather than Johnson's recanted statement and the defendant's denial at

22

trial. Therefore, we find that the evidence was more than sufficient to establish the defendant's guilt and support the defendant's conviction.

As a final note, because the condition of the State's brief fell so far below compliance with Supreme Court Rules 612 (210 Ill. 2d R. 612), 341 (210 Ill. 2d R. 341) and 6 (145 Ill. 2d R. 6), that we feel compelled to comment on this violation of a mandatory requirement. Both the State's and the defendant's briefs inappropriately contained *numerous* improper citations, including the use of "*supras*." However, the State's brief compounded the problem by using a condensed, small font which made the brief extremely difficult to read. As the assistant State's Attorney was admonished in oral argument, we reiterate that the supreme court rules regarding appellate practice are not mere suggestions, but are mandatory rules from which parties must not deviate. We caution that parties who violate these rules will run the risk of having their briefs stricken and sanctions imposed.

Affirmed.

HOFFMAN and THEIS, JJ., concur.